## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| SPHERATURE INVESTMENTS LLC et al. | § | CASE NO. 20-42492 |
| | § | |
| | § | |
| | § | |
| | § | |
| SPHERATURE INVESTMENTS LLC, et al. d/b/a World Ventures Holdings, LLC[1] | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 21-04058 |
| | § | |
| KENNETH E. HEAD | § | |
| | § | |
| Defendants. | § | |

---

## DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE OR, ALTERNATIVELY, MOTION FOR A MORE DEFINATE STATEMENT PURSUANT TO RULE 12(e)

---

**NO HEARING WILL BE CONDUCTED ON THIS MOTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS PLEADING *WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE* SHOWN IN THE CERTIFICATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION. IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT. IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A**

---

[1] The "**Debtors**" or "**WorldVentures**") in the above-described jointly administered Chapter 11 bankruptcy cases ("**Cases**") are Spherature Investments LLC ("**Spherature**") EIN#5471, Rovia, LLC ("**Rovia**") EIN#7705, WorldVentures Marketing Holdings, LLC ("**WV Marketing Holdings**") EIN#3846, WorldVentures Marketplace, LLC ("**WV Marketplace**") EIN#6264, WorldVentures Marketing, LLC ("**WV Marketing**") EIN#3255, WorldVentures Services, LLC ("**WV Services**") EIN#2220.

---

**HEARING WITH APPROPRIATE NOTICE. IF YOU FAIL TO APPEAR AT THE HEARING, YOUR OBJECTION MAY BE STRICKEN. THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MATTER.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Defendant Kenneth E. Head ("**Defendant**" or "**Head**") files this Defendant's Motion to Dismiss First Amended Complaint Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, Alternatively, Motion for a More Definite Statement Pursuant to Rule 12(e), as made applicable by Rule 7012(b)(6) of the Federal Rules of Bankruptcy Procedure, and in support shows the following:

## I. INTRODUCTION

1.      The Debtors' First Amended Complaint (the "**Amended Complaint**") should be dismissed because it fails to state a claim upon which relief can be granted.  Recognizing the inadequacies of the Original Complaint, Debtors completely re-worked their Amended Complaint. The Debtors' claim for breach of contract is based on an allegation that Head solicited and recruited WV Marketing's Sales Representatives and Members, and WV Services' and Rovia's vendors to a Competing Business.  However, Debtors failed to allege a single Sales Representative or Member that Head solicited or recruited, or that any such Sales Representative or Member left WorldVentures because of Head's recruitment.  Further, Debtors failed to allege any facts to support any actions by Head to solicit Debtors' vendors.

2.      Further, Debtors' breach of contract claim fails as a matter of law because Debtors sued on the wrong agreement.  Head signed the Employment Agreement which contains terms of his employment, including his salary and benefits.  The Employment Agreement also provides that WorldVentures would provide Confidential Information to Head and, in return, Head agreed to

restrictive covenants, including an industry-wide prohibition.  Four months later, Head and

WorldVentures signed the Confidentiality Agreement in which WorldVentures agreed to provide

Confidential Information and, in return, Head agreed to restrictive covenants, but the industry-

wide ban was removed.  Under Texas law, an earlier contract may be superseded only to the extent

of the inconsistency with the later contract.[2]  Additionally, for a restrictive covenant to be

enforceable, it must be ancillary to or part of an otherwise enforceable agreement.[3]  In this case,

the restrictive covenants in the Confidentiality Agreement are enforceable only if Debtors'

agreement to provide Confidential Information to Head was the "otherwise enforceable

agreement."  This latter agreement supersedes the Employment Agreement because Head's

agreement to the restrictive covenants in the Confidentiality Agreement, in return for Debtors'

agreement to provide Confidential Information, is inconsistent with that same "subject matter."

The remainder of the Employment Agreement, such as Head's compensation and benefits, remains

intact.

       3.      The Debtors' claim for breach of fiduciary duty is based on the allegations that

Head wrongfully solicited WorldVentures' Sales Representatives, team leaders and vendors.

Debtors failed to identify any Sales Representatives, Members or team leaders that Head has

solicited, and failed to allege that any such Sales Representatives, Members or team leaders left

WorldVentures.  Debtors failed to allege any facts showing that Head negotiated any agreement

between Seacret and any vendor. Moreover, the claims should also be dismissed because the

Debtors' Complaint concerning allegations of harm which are required elements of both Counts

One and Two are legally insufficient because the Complaint only contains conclusory allegations

---

[2] Corbin, supra, at 213.  *Hall v. Pro. Leasing Assocs.*, 550 S.W.2d 392, 394 (Tex. Civ. App. 1977), citing Corbin at 213

[3] Tex. Bus. & Com. Code § 15.50.

---

about some sort of interference with the bankruptcy process.  Plaintiffs failed to allege any facts

to give rise to a plausible claim for damage under either breach of contract or breach of fiduciary

duty as required by the United States Supreme Court in *Ashcroft v. Iqbal*.  In addition, although

the Debtors repeatedly told the Court at the TRO hearing and in their pleadings that they needed

injunctive relief to prevent harm concerning their bankruptcy sale process, Debtors would not

allow any discovery on the sale process in connection with the hearing on the preliminary

injunction.

4.      Because the Debtors failed to state a claim upon which relief can be granted, the

Amended Complaint should be dismissed pursuant to Rule 12(b)(6) or, alternatively, the Debtors

should be ordered to provide a more definite statement under Rule 12(e), both made applicable to

this Adversary Proceeding under Rule 7012 of the Federal Rules of Bankruptcy Procedure.

Debtors have conducted extensive discovery and replead their claim, yet Debtors still failed to

state a claim upon which relief may be granted.  Debtors should not be allowed to amend their

claims again.

## II. ALLEGED FACTS

5.      In their Amended Complaint, the Debtors have alleged certain facts and for the

purpose of this motion, Head has set forth these alleged facts below but by doing so, Head is not

admitting to the truth of such facts and reserves all rights to dispute such facts and allegations.

6.      The Company is part of a multi-level marketing business enterprise that markets

and sells travel- related products and services.   Since 2005, the Company's business enterprise

has specialized in membership-based travel products and services market through direct sales

("**Services**").[4]   The Company provides Services through WV Marketing's network of sales representatives (the "**Sales Representatives**").[5]

7.      More particularly, WV Marketing markets and sells Rovia's curated travel program known as DreamTrips, DreamBreaks and Anytime Escapes – each marketed with the slogan "You Should Be Here.[6]   All Dream Trips, DreamBreaks and Anytime Escapes travel is booked through Rovia.[7]   Notably, DreamTrips, DreamBreaks, Anytime Escapes, WorldVentures, Rovia, You Should Be Here, and all associated logos are trademarks of one or more of the Company.[8]

8.      The Company's revenue is derived mainly from the sale of Services through Sales Representatives and the membership fees and travel-related sales that they generate.[9]   Thus, the "going-concern" assets of the Company are primarily the Sales Representatives and the sales platform through which they operate (*i.e.* the downline).[10]

9.       From 2017 through January 2021, Head served as WorldVentures' President and CSO.[11]  On July 12, 2018, Head executed the Employment Agreement with WorldVentures.[12]  The Employment Agreement addresses Head's duties and obligations to the Company.[13]

10.     As President and CSO, Head owed WorldVentures contractual and fiduciary duties and was obligated to put the Company's interests before his own and faithfully and diligently further the business and interests of the Company.[14]   Indeed, Head agreed that he held an

---

[4] Dkt. 76, ¶ 12.
[5] Dkt. 76, ¶ 12.
[6] Dkt. 76, ¶ 13.
[7] Dkt. 76, ¶ 13.
[8] Dkt. 76, ¶ 13 [conclusory allegation].
[9] Dkt. 76, ¶ 14.
[10] Dkt. 76, ¶ 14.
[11] Dkt. 76, ¶ 15.
[12] Dkt. 76, ¶ 15.
[13] Dkt. 76, ¶ 15 [conclusory allegation].
[14] Dkt. 76, ¶ 16. [conclusory allegation]

"important, senior position with the Company and [Head's] job responsibilities have a significant impact on substantially all aspects of the Company's business."[15]  Head also acknowledged that the "Company does business throughout the world and [Head's] job responsibilities affect the Company's operations in all markets in which the Company conducts business or has Customers."[16]

11.    Under the Employment Agreement, WorldVentures agreed to provide Head with new and additional confidential Company information, a base salary, an incentive plan, rights to a severance package, as well as a bonus.[17]  Head acknowledged and agreed that his access to "Confidential Information concerning the Company and its Customers … gives the Company a considerable competitive advantage."[18]  He agreed that the "Company has expended and will continue to expend substantial time, effort, and financial resources in developing its Confidential Information and in maintaining its competitive advantage."[19]  As detailed in Article III of the Employment Agreement, Head's access to the Company's Confidential Information was tightly controlled and subject to prohibitions against unauthorized use and disclosure.[20]

12.    Under his Employment Agreement and the WorldVentures' Confidentiality and Proprietary Rights Agreement ("**Confidentiality Agreement**"), Head agreed to protect the Company's Confidential Information.[21]  Among those covenants, Head agreed "not to directly or indirectly disclose, publish, communicate or make available, in whole or part," any Confidential

---

[15] Dkt. 76, ¶ 16,
[16] Dkt. 76, ¶ 16.
[17] Dkt. 76, ¶ 17 [conclusory allegation].
[18] Dkt. 76, ¶ 17 [conclusory allegation].
[19] Dkt. 76, ¶ 17 [conclusory allegation].
[20] Dkt. 76, ¶ 17 [conclusory allegation].
[21] Dkt. 76, ¶ 18 [conclusory allegation].

Information "to any entity or person" both during and after his employment.[22]   And, upon termination of his employment, Head agreed to return all Confidential information to the Company.[23]  Head also agreed that "he will not at any time, including following the termination of his employment with the Company for any reason, use for his own purposes or disclose to any Person … any Confidential Information of the Company, any of its Customers, or any of the Company's or its Customer's employees."[24]

13.     Importantly, Head expressly agreed not to compete with the Company.[25]   As provided in Section 3.02 of the Employment Agreement, "in consideration … of the Company's commitments and contractual obligations to [Head] pursuant to this [Employment] Agreement, [Head] hereby covenants and agrees during the Non-Compete Period" to adhere to the following non-competition restrictions, collectively referred to herein as the "**Non-Compete Provisions**":

    a) Refrain from participating, either directly or through an Affiliate, in or with any Competing Business that resides in or operates in a Territory where the Company conduct business;

    b) Refrain from soliciting, either directly or through an Affiliate, any of the Company's Customers' including WV Marketing Members;

    c) Refrain from employing or soliciting, either directly or through an Affiliate, any of the Company's employees;

    d) Refrain from interfering with or soliciting, either directly or through an Affiliate, any of the Company's vendors, suppliers, or contractors; and

    e) Refrain from soliciting Sales Representatives to a Competing Business.[26]

---

[22] Dkt. 76, ¶ 18.
[23] Dkt. 76, ¶ 18.
[24] Dkt. 76, ¶ 18.
[25] Dkt. 76, ¶ 19 [conclusory allegation].
[26] Dkt. 76, ¶ 19.

The Non-Compete Provisions are subject to a 24-month period following termination of Head's employment (the "**Non-Compete Period**").[27]

14.     Head agreed that these express covenants and restrictions "shall continue in full force and effect" after termination of his employment."[28]  Equally important, Head acknowledged and agreed that the covenants and restrictions were "reasonable in their terms and do not impose any undue hardship" on his "current or future employment prospects" and are fully supported by the severance compensation … and the Company's disclosure to [Head] during the term of his employment of valuable Confidential Information of the Company."[29]  He also agreed "that the competitive use of the Company's Confidential information would cause grievous damage to the Copany's business, and the Company would not hire [Head] and disclose Confidential Information to him in the absence of the protections afforded by the confidentiality and [n]on-[C]ompete [P]rovisions" as set forth in his Employment Agreement.[30]

15.     The Company provided Head with new and additional Confidential Information as part of the consideration for his employment.[31]  Specifically, as Head has admitted, after executing the Employment Agreement, Head had continuing access to the Company's downline, along with financial records and reports, marketing programs and acquisition strategies – including WorldVentures' negotiations of an asset purchase agreement with Seacret, and internal discussions regarding bankruptcy.[32]  Head also had access to the Company's Exigo database.[33]  This database contains sensitive concerning the Plaintiff's Customers, Members, and Sales Representatives,

---

[27] Dkt. 76, ¶ 19.
[28] Dkt. 76, ¶ 20.
[29] Dkt. 76, ¶ 20.
[30] Dkt. 76, ¶ 20.
[31] Dkt. 76, ¶ 21 [conclusory allegation].
[32] Dkt. 76, ¶ 21.
[33] Dkt. 76, ¶ 21.

including payment and commission information, subscriptions, genealogies (i.e., downline network), membership orders, and other key attributes.[34] The information in Exigo changes daily and varies substantially over time.[35]

16.    In addition, Head admits he had access to the Company's Business Intelligence ("BI") tools and technologies, including ad-hoc specialty requests, Power BI, SQL Server Reporting Services ("SSRS"), and Klipfolio.[36] Head routinely accessed and utilized the Company's BI tools and had reports generated reflecting near-real time data and analysis concerning the Sales Representatives and Members.[37] The underlying data from the Company's BI tools is in constant flux and provides valuable insights into, among other things, WV Marketing's travel membership service.[38] In short, as Head has admitted under oath, Head received new and additional Confidential Information throughout his employment for years after he signed the Employment Agreement.[39]

17.    With Head as President and CSO, the Company experienced a precipitous revenue decline.[40] This, along with other factors, led WorldVentures to seek various options to improve financial viability and avoid filing for Chapter 11 relief.[41] One such option – aimed at improving the Company's liquidity and elevating the income and morale of WV Marketing's Sales Representatives – involved negotiations with Seacret regarding possible business arrangements.[42]

---

[34] Dkt. 76, ¶ 21.
[35] Dkt. 76, ¶ 21 [conclusory allegation].
[36] Dkt. 76, ¶ 22.
[37] Dkt. 76, ¶ 22.
[38] Dkt. 76, ¶ 22.
[39] Dkt. 76, ¶ 22 [conclusory allegation].
[40] Dkt. 76, ¶ 23 [conclusory allegation].
[41] Dkt. 76, ¶ 23 [conclusory allegation].
[42] Dkt. 76, ¶ 23.

18.     On July 22, 2020, purportedly to drive additional value for its Sales Representatives, WV Marketing entered into a co-marketing agreement ("CMA") with Seacret, wherein Seacret agreed to make its products available to WV Marketing's Sales Representatives to sell and supplement their income.[43]  Head actively negotiated and executed the CMA on behalf of WV Marketing.[44]

19.     By allowing Seacret an expanded sales force to promote its products and, in turn, affording WV Marketing's Sales Representatives additional products to sell, the parties' relationship appeared to be mutually aligned.[45]  Therefore, on November 10, 2020, WorldVentures and Seacret entered into a letter of intent agreement ("**LOI**") to outline Seacret's proposed acquisition of certain assets of WorldVentures.[46]

20.     The next day – disguised as a way to add additional value to the Company, to "protect and maintain [WV Marketing's salesforce" and as a prelude to the asset sale – Head worked with others to replace the CMA with a limited solicitation agreement ("**LSA**") between WV Marketing and Seacret on far less favorable terms.[47]  Head had a key role in negotiating the LSA.[48]  In fact, AS Izhak Ben Shabat, Seacret's Managing Member and Chief Executive Officer, put it, Wayne Nugent was "not involved in the details" when it came to these agreements – Head was.[49]

21.     In accordance with the LSA, WV Marketing granted Seacret certain rights to (a) solicit WV Marketing's network of Sales Representatives to sell Seacret's dietary, nutritional, and

---

[43] Dkt. 76, ¶ 24.
[44] Dkt. 76, ¶ 24 [conclusory allegation].
[45] Dkt. 76, ¶ 25.
[46] Dkt. 76, ¶ 25.
[47] Dkt. 76, ¶ 26 [conclusory allegation].
[48] Dkt. 76, ¶ 26 [conclusory allegation].
[49] Dkt. 76, ¶ 26 [conclusory allegation].

skincare products, (b) access certain Confidential Information, including one of WV marketing's most critical assets for a limited purpose: the Exigo database containing WV Marketing's downline sales network, and (c) life [sic] certain non-solicit provisions with its Sales Representatives solicited by Seacret.[50]  In exchange, Seacret agreed to pay WV Marketing a future product-sales royalty – in an amount not to exceed $12 million – based on the amount of Seacret products sold by WV Marketing's Sales Representatives.[51]  To date, Seacret has paid less than 8% of that promised consideration.[52]  Notably, the LSA did not permit Seacret to recruit WV Marketing's Members (i.e. customers), employees, suppliers, or vendors.[53]  With respect to Head, the LSA expressly prohibited solicitation by Seacret.[54]  Nor did the LSA "establish a joint venture or partnership between the Parties."[55]  Rather, as Head and Seacret both acknowledge, the LSA was only supposed to be an "interim" agreement during efforts to finalize the sale of certain of WorldVentures' assets to Seacret – an agreement that never materialized.[56]

22.    The LSA never authorized Seacret to solicit or sell Seacret products directly to WV Marketing's customers, which the LSA defines "Members," as opposed to Sales Representatives.[57] In fact, Section 1 of the LSA is titled "Right to Solicit [WV Marketing's Sales Representatives Only."[58]

23.    Seacret expressly agreed that WV Marketing "shall be responsible for assisting the [WV Marketing] Sales Representatives in continuing to market and sell [WV Marketing's]

---

[50] Dkt. 76, ¶ 27.
[51] Dkt. 76, ¶ 27.
[52] Dkt. 76, ¶ 27.
[53] Dkt. 76, ¶ 27.
[54] Dkt. 76, ¶ 27.
[55] Dkt. 76, ¶ 27.
[56] Dkt. 76, ¶ 27.
[57] Dkt. 76, ¶ 28.
[58] Dkt. 76, ¶ 28.

lifestyle membership products and services to customers, and that [WV Marketing] shall be solely responsible for fulfilling such sales.[59] Seacret also agreed that the LSA "shall have no impact upon [WV Marketing's] sale of travel products to its Members or through the [WV Marketing] Sales Representatives, and that any fulfillment of such travel products by Seacret will be negotiated independent of this Agreement.[60] In other words, the LSA facially prohibits Seacret from offering its own travel products and services to any Sales Representatives or Members without a separately negotiated contract.[61] No such contract exists, nor has it ever been discussed.[62]

24.     Prior to entering into these agreements, Seacret did not market or sell any membership-based travel product and services to its sales agents or customers.[63] Seacret had only marketed and sold dietary, nutritional, and skincare products.[64] In fact, the LSA specifically defines "Products" of Seacret as "dietary supplements, nutritional and skincare … through its network of sales representatives."[65] Thus, Seacret was not a "Competing Business" as defined in Head's Employment Agreement when the LSA was executed.[66] In short, nothing in the LSA authorizes or contemplates that Seacret would be starting its own competing membership-based travel business.[67] Presumably, had Head known this, he would have observed his fiduciary duties to ensure that the LSA contained adequate protections for the Company's most valuable assets.[68]

---

[59] Dkt. 76, ¶ 29.
[60] Dkt. 76, ¶ 29.
[61] Dkt. 76, ¶ 29 [conclusory allegation].
[62] Dkt. 76, ¶ 29.
[63] Dkt. 76, ¶ 30.
[64] Dkt. 76, ¶ 30.
[65] Dkt. 76, ¶ 30.
[66] Dkt. 76, ¶ 30 [conclusory allegation].
[67] Dkt. 76, ¶ 30 [conclusory allegation].
[68] Dkt. 76, ¶ 30 [conclusory allegation].

25.     However, the landscape changed after Seacret hired head to become its President and Chief Business Development Officer.[69]  Despite the express limitations in the LSA, as both Head and Ben Shabat admitted in sworn testimony during the preliminary injunction hearing in this case, Seacret is now marketing its own membership-based lifestyle and travel program through direct sales under the name "Club Seacret" with Head at the helm.[70]  With Head's guidance, Seacret is using WV Marketing's Sales Representatives to launch Seacret's Competing Business.[71]  Indeed, Head was a part of Seacret's efforts to solicit WV Marketing's Sales Representatives and Members.[72]  To date, by Head's own admission, at least 15, 000 Members and Sales Representatives are affiliated or do business with Seacret, with "most" of these Sales Representatives now no longer actively marketing the Services.[73]  Of course, had Head disclosed Seacret's true intentions to open a Competing Business, WV Marketing would not have signed the LSA.[74]

26.     Upon information and belief, Head ostensibly used the LSA as a pretext to lay the groundwork for his move to Seacret and their coordinated effort to compete with the Plaintiffs' Services through recruitment of WV Marketing's downline sales network and to re-create the Plaintiffs' travel business at Seacret.[75]

27.     In advance of his departure from the Company, on or about December 11, 2020, Head led a call with team leaders, some of the highest performing Sales Representatives, and the

---

[69] Dkt. 76, ¶ 31 [conclusory allegation].
[70] Dkt. 76, ¶ 31.
[71] Dkt. 76, ¶ 31 [conclusory allegation].
[72] Dkt. 76, ¶ 31 [conclusory allegation].
[73] Dkt. 76, ¶ 31.
[74] Dkt. 76, ¶ 31 [conclusory allegation].
[75] Dkt. 76, ¶ 32 [conclusory allegation].

Company's former employees.[76] Included on that call was Ben Shabat, who declared that whether the "deal" with WorldVentures goes through or not, Seacret will move forward "100%", as "no one can stop this train."[77] Ben Shabat also told those Sales Representatives that they are "already distributors of Seacret" no matter what happens in the "legal process" (i.e., the Debtors' bankruptcy proceedings).[78]

28.    Ten days later, on December 21, 2020, Plaintiffs as debtors in possession, filed voluntary petitions under chapter 11 of the Bankruptcy Code, thereby initiating the above-captioned bankruptcy cases (the "Chapter 11 cases") in which this adversary proceeding is filed.[79]

29.    Shortly after the bankruptcy filing, Head resigned his position with the Company on December 31, 2020.[80] The day before he resigned, Head instructed WorldVentures' former Senior VP of Global Sales, Justin Call (now with Seacret), to prepare WV Marketing's financial information for events in 2021 and send it to Seacret.[81]

30.    Particularly significant, mere hours before tendering his resignation, Head encouraged WV Marketing's team leaders and Sales Representatives to sell Seacret's new membership-based travel products and services – telling them there was no impediment to Seacret selling travel.[82] Specifically, in a December 31, 2020 WhatsApp message to the Company's employees, WV Marketing's team leaders and Sales Representatives, Head says the following:

> "[T]here has ALREADY been a sale … That sale is COMPLETE and does not require any court approval… ALSO, Nothing prohibits the sale of travel or a travel memberships… In other words, the plan is the same as the plan was. No matter

---

[76] Dkt. 76, ¶ 33.
[77] Dkt. 76, ¶ 33.
[78] Dkt. 76, ¶ 33.
[79] Dkt. 76, ¶ 34.
[80] Dkt. 76, ¶ 35.
[81] Dkt. 76, ¶ 35.
[82] Dkt. 76, ¶ 36.

how uncertain a court process looks… Not waiting on that process to complete for us to forge our way through what has already taken root and is growing rapidly."[83]

31.     To be clear, WorldVentures has not executed or finalized any asset purchase agreement.[84]   And, nowhere in the LSA does it permit or make any reference to Seacret selling membership-based travel products and services.[85]   Head admitted that Seacret was not a Competing Business (nor did Seacret plan to launch its own competing travel product and services) at the time of the LSA.[86]

32.     If Head's position in his WhatsApp message is now correct, rather than protecting the Company consistent with his fiduciary obligations as President and CSO, Head personally negotiated a deal that allowed Seacret to effectively takeover the Company's travel business without adequate consideration.[87]   In short, the LSA does not authorize Seacret to open a Competing Business.[88]   And, if it does, Head breached his fiduciary duties by enabling and participating in same.[89]

33.     On January 6, 2021 – six days after resigning – Head became the President and Chief Business Development Officer of Seacret.[90]   After only a few weeks in Head's new role, Seacret announces its own competing "lifestyle" brand, which now includes a membership-based direct sales travel business under the "Club Seacret" umbrella.[91]

---

[83] Dkt. 76, ¶ 36.
[84] Dkt. 76, ¶ 37.
[85] Dkt. 76, ¶ 37.
[86] Dkt. 76, ¶ 37.
[87] Dkt. 76, ¶ 38 [conclusory allegation].
[88] Dkt. 76, ¶ 38.
[89] Dkt. 76, ¶ 38 [conclusory allegation].
[90] Dkt. 76, ¶ 39.
[91] Dkt. 76, ¶ 39.

34.    It is beyond refute that Head helped lead the planning, formulation, and implementation of Club Seacret, which offers a nearly identical travel service to the Company's Services such as DreamTrips, DreamBreaks, and Anytime Escapes.[92]  By way of example, internal e-mails at Seacret show Head's involvement with the development and launch of Club Seacret, including its travel program.[93]  Even Ben Shabat, Seacret's Managing member and Chief Executive Officer, publicly commended "what Eddie [Head] has done putting together this [travel] program with [Seacret's] vendors.[94]

35.    In late-January 2021, Head and former WV Marketing Sales Representatives participated in campaign videos to promote Seacret's new "lifestyle" brand.[95]  In fact, dozens of promotional videos referencing Seacret's new travel program have surfaced.[96]  The promotional campaigns encourage WV Marketing's Sales Representatives to stop selling Services, ending their affiliation with WV Marketing, and, instead, sell Seacret's "newly acquired" travel services.[97]

36.    Notably, Head appears in a video on January 29, 2021 sitting next to Ben Shabat, who announced Head's position with Seacret and a "partnership" to create a membership-based travel business within Seacret.  Ben Shabat announced Seacret is "tak[ing] one of the unique travel experiences in the world [i.e., the Company's travel experience] and implement[ing] the program over here at Seacret."[98]

37.    In the promotional videos, Head admits: (a) "we have been grooming a global team, and we brought in some of the best talent we could;" (b) "we want to make sure that we partner

---

[92] Dkt. 76, ¶ 40 [conclusory allegation].
[93] Dkt. 76, ¶ 40.
[94] Dkt. 76, ¶ 40.
[95] Dkt. 76, ¶ 41.
[96] Dkt. 76, ¶ 41 [conclusory allegation].
[97] Dkt. 76, ¶ 41.
[98] Dkt. 76, ¶ 42.

with the very best suppliers and vendors around the planet;" (c) "we have a duty to uphold this brand and to protect this brand;" and (d) "you are going to be able to take advantage of this membership all over the world; and (e) "we're taking the knowledge of all of our wins … and all of our victories at the same time: and will "apply everything we've learned" to provide a "membership experience and lifestyle company" for Seacret."[99]   Upon information and belief, "this brand" that Head is referring to is DreamTrips, DreamBreaks, and Anytime Escapes.[100]   The "global team" is the Company's former members and WV Marketing's team leaders and Sales Representatives.[101]   And, at least one of Seacret's "supplier's and vendors" is a Rovia vendor.[102]

38.     Accordingly, one of Seacret's travel providers is Grouply Ventures, LLC ("**Grouply**"), a company owned by Virginia (Gini) Trask ("**Trask**").[103]   Grouply appears to provide travel packages that are substantially similar to travel opportunities offered by Top Tier Travel, Inc. ("**Top Tier**") to Rovia pursuant to exclusivity agreement.[104]   Notably, Trask is the President of Top Tier and signed the exclusivity agreement on Top Tier's behalf.[105] Communications between Trask and Head indicate that, in an attempt to try to circumvent that exclusivity agreement, Head solicited Trask to provide "incentive trips" to Seacret.[106]   As a critical part of that recruitment effort, Head convinced Trask that, unlike the Company, Seacret did not offer travel products or services through membership-based, direct sales despite knowing of Seacret's ongoing efforts to do so.[107]

---

[99] Dkt. 76, ¶ 43.
[100] Dkt. 76, ¶ 43.
[101] Dkt. 76, ¶ 43.
[102] Dkt. 76, ¶ 43.
[103] Dkt. 76, ¶ 44.
[104] Dkt. 76, ¶ 44 [conclusory allegation].
[105] Dkt. 76, ¶ 44.
[106] Dkt. 76, ¶ 44.
[107] Dkt. 76, ¶ 44.

39.     Additional videos show Marc Accetta, WV Services former director of training, now working for Seacret and implementing WV Marketing's training program at Seacret.[108] Accetta's contributions to Seacret have already been recognized.[109]  Specifically, a Seacret agent acknowledges that the "the [sic] two things that created the magic" of Plaintiffs' Services, the two "most valuable … were Accetta's leadership development and training program and [the] specific curated trips."[110]  These "trips" are specifically curated trip packages created by Rovia for WV Marketing's Sales Representatives and Members.[111]

40.     Significantly, emails show that Head – while still employed with the Company – negotiated Accetta's contract with Seacret and disclosed certain confidential information regarding the contract terms of Accetta's relationship with WV Services to Ben Shabat in mid-October 2020 and again after he resigned, despite Head's fiduciary obligations (e.g., loyalty, full disclosure) to the Company.[112]

41.     In short, after negotiating agreements that gave Seacret limited access to the most vital competitive information regarding the Company's business for the sole purpose of allowing Sales Representatives to sell Seacret's nutritional and skincare products, and only days after the Debtors filed bankruptcy, Head resigned.[113]  A few days later, Head emerged as the President of Seacret's new competing "lifestyle" membership-based travel program marketed through direct sales, which is transparently designed to trade off the Company's lifestyle travel platform, utilizing the Company's poached "global team" to do so.[114]  The timing of his resignation, the

---

[108] Dkt. 76, ¶ 45.
[109] Dkt. 76, ¶ 45 {conclusory allegation].
[110] Dkt. 76, ¶ 45.
[111] Dkt. 76, ¶ 45.
[112] Dkt. 76, ¶ 46.
[113] Dkt. 76, ¶ 47.
[114] Dkt. 76, ¶ 47 [conclusory allegation].

communications leading up to and after his resignation, and his immediate affiliation with Seacret, support the logical conclusion that Head orchestrated this effort while he remained an officer of the Company.[115]  Indeed, within a few weeks of Head's announcement as its President and Chief Business Development Officer, Seacret launched Club Seacret to market – touting the "most unique travel experiences in the world."[116]

42.     In paragraphs 48 through 60 of their Complaint, Plaintiffs allege their causes of action.  The entirety of paragraphs 48 through 60 are conclusory allegations.

### III. MOTION TO DISMISS CAUSES OF ACTION ASSERTED BY PLAINTIFF PURSUANT TO RULE 12(b)(6)

A.     **Standards of Pleading.**

43.     A motion to dismiss challenges the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Pleadings which state a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[117]  Pursuant to Fed. R. Civ. P. 8(a)(2), a statement showing such entitlement to relief must include "enough facts to state a claim to relief that is plausible on its face."[118]  Claims "ha[ve] facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[119]  In determining whether a claim is facially plausible, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice."[120]  "Determining whether a claim for relief is plausible

---

[115] Dkt. 76, ¶ 47 [conclusory allegation].
[116] Dkt. 76, ¶ 47.
[117] Fed. R. Civ. P. 8(a)(2).
[118] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[119] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *citing Twombly*, 550 U.S. at 556.
[120] *Id.*

is a context-specific task which requires the court to draw on its judicial experience and common sense."[121]

44.    In order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must assert "more than labels and conclusions[;] *a formulaic recitation of the elements of the cause of action will not do.*"[122]    Instead, "[f]actual allegations must be enough to raise a right of relief above the speculative level."[123]    If the properly-pleaded facts of a complaint do not permit a court to infer "more than the mere possibility of misconduct," then the pleader has not shown it is entitled to relief.[124]    "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."[125]

45.    In *Iqbal*, the Supreme Court established a two-step process for determining whether a complaint raises a right to relief above the speculative level.    First, a court must identify any conclusory allegations, as they are "not entitled to the assumption of truth."[126]    Second, the court must consider if the assumption of truth attributed to the non-conclusory factual allegations plausibly suggests an entitlement to relief.[127]    Determining whether the allegations are "plausible" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[128]

46.    "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which

---

[121] *Iqbal*, 556 U.S. at 679.
[122] *Twombly*, 550 U.S. at 555 (emphasis added), *citing Papasan v. Allain*, 478 U.S. 265, 286 (1986).
[123] *Id*.
[124] *Iqbal*, 556 U.S. at 679, *citing* Fed. R. Civ. P. 8(a)(2).
[125] *Id*., *citing Twombly*, 550 U.S. at 556
[126] *Iqbal*, 556 U.S. at 679; *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) ("[W]e will not strain to find inferences favorable to the plaintiffs and we will not accept conclusory allegations, unwarranted deductions, or legal conclusions.").
[127] *Id*.
[128] *Id*.

a court may take judicial notice."[129]  Further, when a plaintiff expressly relies on the terms of a

written document in a complaint, a defendant may proffer that document for use in a 12(b)(6)

motion.[130]

47.     In their Complaint, Debtors assert two different causes of action against Head,

which are largely based on the Employment Agreement.  The causes of action include (1) Count

One for breach of the Employment Agreement; and (2) Count Two for breach of fiduciary duty.

Debtors removed their remedy of permanent injunctive relief from the Amended Complaint.

Debtors' Complaint is rife with conclusory allegations.  All of the counts should be dismissed as

a matter of law under Rule 12(b)(6) as incorporated into this Adversary under Federal Rule of

Bankruptcy Procedure 7012 because they are factually and legally insufficient.

**B.     Debtors' breach of contract claim should be dismissed because Debtors failed to
state a claim upon which relief may be granted.**

**i.     Debtors failed to allege facts related to a breach of contract.**

48.     Count One for breach of contract must be dismissed because it is based on

conclusory allegations unsupported by facts that give rise to a plausible claim.  The elements of a

breach of contract claim in Texas are (1) the existence of a valid contract; (2) performance or

tendered performance by the plaintiff; (3) the breach of that contract by the defendant and (4)

damages sustained by the plaintiff as a result of the breach.[131]  Debtors failed to allege sufficient

facts of breach of an agreement or damages to give rise to a plausible claim for breach of contract.

49.     Plaintiffs allege that Head breached the Employment Agreement "by leading

Seacret's efforts to solicit and recruit WV Marketing's Sales Representatives and Members, and

---

[129] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).

[130] *Kopp v. Klein*, 722 F.3d 327, 333 (5th Cir. 2013), cert. granted, vacated on other grounds.

[131] *Mullens v. TestAmerica, Inc.*, 564 F. 3d 386 (5th Cir. 2009), citing *Aguilar v. Segal*, 167 S. W. 3d 443, 450 (Tex.
App—Houston [14th Dist], 2005 pet. den'd).

WV Services' and Rovia's vendors to a Competing Business."[132]  Debtors' conclusory allegations related to this claim include the following which are summarized below with the Debtors' allegations on the left of the chart along with Head's response on the right:

| | |
|---|---|
| "With Head's guidance, Seacret is using WV Marketing's Sales Representatives to launch Seacret's Competing Business."[133] | Debtors failed to identify any Sales Representatives or Members that Head solicited to support this conclusory allegation. |
| "Indeed, Head was part of Seacret's efforts to solicit WV Marketing's Sales Representatives and Members."[134] | Again, Debtors failed to identify any Sales Representatives or Members that Head solicited to support this conclusory allegation.  Debtors failed to allege any facts as to what actions Head took to purportedly solicit WorldVentures' Sales Representatives or Members. |
| "Upon information and belief, Head ostensibly used the LSA as a pretext to lay the groundwork for his move to Seacret and their coordinated effort to compete with the Plaintiffs' Services through recruitment of WV Marketing's downline sales network and to re-create the Plaintiffs' travel business at Seacret."[135] | Debtors failed to allege any facts to support this conclusion that Head coordinated an effort to compete with Plaintiffs' Services through recruitment of WV Marketing's downline sales network, and failed to allege a single Sales Representative or Member that Head recruited. |
| "Communications between Trask and Head indicate that, in an attempt to try to circumvent that exclusivity agreement, Head solicited Trask to provide "incentive trips" to Seacret. | Debtors failed to allege any facts as to how Head purportedly solicited Trask or her companies, and failed to allege that Trask or her companies had any business relationship with Seacret as a result of any such purported solicitation. |
| "Significantly, emails show that Head – while still employed with the Company – negotiated Accetta's contract with Seacret and disclosed certain confidential information regarding the contract terms of Accetta's relationship with WV Services to Ben Shabat in mid-October 2020 and again after he resigned, despite Head's fiduciary | Debtors failed to allege any facts to support the conclusory allegations related to Accetta.  Debtors failed to allege how Head was involved in any such negotiations or allege any actions taken by Head in such negotiations. Debtors simply conclude that Head negotiated the contract. Further, Debtors failed to allege any facts related to the disclosure of Accetta's |

---

[132] Dkt. 76, ¶ 52.
[133] Dkt. 76, ¶ 31.
[134] Dkt. 76, ¶ 31.
[135] Dkt. 76 ¶ 31.

| obligations (e.g., loyalty, full disclosure) to the Company."[136] | contract terms with WV Services. Debtor simply conclude that Head made such disclosure. |

50.    In the Amended Complaint, Plaintiffs modified their claim that Head breached the Employment Agreement related to confidential information.  Plaintiffs allege that Head breached the Employment Agreement "through the improper possession, use and/or disclosure of the Company's confidential information after terminating his employment."[137]  Debtors' conclusory allegations related to this claim include the following which are summarized below with the Debtors' allegations on the left of the chart along with Head's response on the right:

| "It is beyond refute that Head helped lead the planning, formulation, and implementation of Club Seacret, which offers a nearly identical travel service to the Company's Services such as DreamTrips, DreamBreaks, and Anytime Escapes."[138] | Debtors failed to allege any facts to support this conclusion. Debtors failed to allege any fact that Head is using, or has disclosed, any of WorldVentures' Confidential Information. |

Debtors did not allege any other facts that Head has used or disclosed WorldVentures' Confidential Information.  Debtors previously alleged that Head disclosed WorldVentures' Confidential Information related to LSA.  After Head raised the issue that any such disclosure was done by Debtors voluntarily, Plaintiffs apparently recognized that claim was baseless and removed it from the Amended Complaint.

51.    Debtors failed to allege a single fact to support these conclusory allegations. Debtors did not allege any facts as to what information Head used or disclosed to Seacret or anyone

---

[136] Dkt. 76, ¶ 46.
[137] Dkt. 76, ¶ 52.
[138] Dkt. 76, ¶ 40.

else outside of WorldVentures.  Debtors failed to allege any fact as to when such use or disclosure

occurred.  Debtors failed to allege to whom specifically Head made any such disclosure.

### ii. <u>Debtors failed to allege facts that they have been damaged by any purported breach of contract.</u>

52.     Additionally, Debtors must allege a plausible claim that they have been damaged

by any such breach.  As for damages on their breach of contract claim, Debtors allege the following

conclusory allegations which are summarized below with the Debtors' allegations on the left and

Head's responses on the right:

| | |
|---|---|
| "Because of Head's breaches of his Employment Agreement and the non-disclosure covenants and Non-Compete Provisions both during and after his employment, the Plaintiffs have suffered economic damages, lost profits, and/or loss of goodwill in amounts in excess of the jurisdictional limits of this Court.  Further, Head's actions have had a detrimental effect on Plaintiffs' bankruptcy estate and the ability to effectuate a successful chapter 11 bankruptcy."[139] | Debtors failed to allege a single fact as to damage related to the breach of contract claim.  Debtors failed to allege what profits they have lost.  Debtors failed to allege a single fact identifying any Sales Representative, vendor or supplier that they lost and was attributable to action or inaction by Head, or how such loss resulted in damage.  Debtors failed to allege a single fact as to how Head's actions impact Debtors' "ability to effectuate a successful chapter 11 bankruptcy."  To the contrary, in the expedited discovery, Debtors refused to allow Head to conduct any discovery on this claim. |
| "In so doing, Head thereby preserved his own financial welfare while further deteriorating the financial welfare of WorldVentures and its respective creditors." | Debtors failed to allege a single fact in support of this conclusion.  Debtors failed to allege any fact that its financial welfare is deteriorating because of any use or disclosure by Head of any confidential information or otherwise. |

---

[139] Dkt. 76, ¶ 53.

53.    Debtors' allegations for their breach of contract claims do not meet the requirements of *Iqbal* and *Twombly*. Count One for breach of contract must be dismissed as a matter of law.

### iii.    Debtors' breach of contract claim fails as a matter of law because Debtors sued on the wrong agreement which was superseded.

54.    Debtors' claim for breach of contract must be dismissed because the claim is premised on the wrong agreement. Debtors' claim that Head breached the Employment Agreement, including "the confidentiality obligations and Non-Compete Provisions therein." However, the terms and conditions related to the restrictive covenants in the Employment Agreement were superseded by the terms and conditions in the Confidentiality Agreement as a matter of law.

55.    When a plaintiff expressly relies on the terms of a written document in a complaint, a defendant may proffer that document for use in a 12(b)(6) motion.[140] Debtors expressly rely on the terms of the Employment Agreement in the Amended Complaint.[141] Additionally, Debtors expressly rely on the terms of the Confidentiality Agreement in the Amended Complaint.[142] Therefore, Head proffers these two agreements which are attached as Exhibits 1 and 2 to the Amended Complaint.

56.    The general rules of contract construction are well established. Under Texas law, if there is no ambiguity in a contract, its construction and meaning become a question of law for the court to determine.[143] The Court's primary concern when construing a written contract is to

---

[140] *Kopp v. Klein*, 722 F.3d 327, 333 (5th Cir. 2013), cert. granted, vacated on other grounds.
[141] Dkt. 76, ¶¶ 15, 17.
[142] Dkt. 76, ¶ 18.
[143] *Baghaei v. Appone, Inc.*, No. 2-08-413-CV, 2009 WL 1996297, at *3 (Tex. App.—Ft. Worth July 9, 2009), citing *Calpine Producer Services, L.P. v. Wiser Oil Co.,* 169 S.W.3d 783, 787 (Tex.App.-Dallas 2005, no pet.).

---

ascertain the true intentions of the parties as expressed in the instrument.[144]  The Court examines

and considers the entire writing in an effort to harmonize and give effect to all provisions of the

contract so that none will be rendered meaningless.[145]  There is a presumption that the parties to

the contract intend every clause to have some effect.[146]  Courts give terms their plain, ordinary,

and generally accepted meaning unless the contract shows that the parties used them in a technical

or different sense.[147]  The intent of the parties must be taken from the contract itself, not from the

parties' present interpretation, and the contract must be enforced as written.[148]  The existence of a

valid contract is an essential element of a breach of contract claim.[149]

57.     Head and WorldVentures Holdings entered into the Employment Agreement on

July 12, 2018.  Related to Debtors' claim that Head cannot work for a "Competing Business," the

Employment Agreement provides:

> (e)     Competing Business in the Territory. The Executive acknowledges and agrees that in and as a result of his employment by the Company the Executive will have access to Confidential Information concerning the Company and its Customers that gives the Company a considerable competitive advantage.  The Executive acknowledges and agrees that Company has expended and will continue to expend substantial time, effort, and financial resources in developing its Confidential Information and in maintaining its competitive advantage. Accordingly, in consideration of the foregoing and of the Company's commitments and contractual obligations to the Executive pursuant to this Agreement, the Executive hereby covenants and agrees during the Non-Compete Period not to become an Affiliate with any Competing Business that resides in or operates in the Territory.

---

[144] *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983); *Heil Co. v. Polar Corp.,* 191 S.W.3d 805, 810 (Tex.App.-Fort Worth 2006, pet. denied).
[145] *Coker,* 650 S.W.2d at 393.
[146] *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996); *XCO Prod. Co. v. Jamison,* 194 S.W.3d 622, 627 (Tex.App.-Houston [14th Dist.] 2006, pet. denied).
[147] *Heritage Res.,* 939 S.W.2d at 121.
[148] *Calpine Producer Services, L.P.,* 169 S.W.3d at 787.
[149] *Winchek v. Am. Express Travel Related Services Co., Inc.,* 232 S.W.3d 197, 202 (Tex.App.-Houston [1st Dist.] 2007, no pet.).

Under the Employment Agreement, in exchange for Head's agreement not to become "an Affiliate with any Competing Business," WorldVentures agreed to give Head "access to Confidential Information." The Employment Agreement is unambiguous as to the terms and conditions of the restrictive covenants and the consideration allegedly provided by Debtors.

58. Not long after the execution of the Employment Agreement, Head and WorldVentures Holdings entered into the Confidentiality Agreement on October 4, 2018:

> This Employee Confidentiality and Proprietary Rights Agreement (**"Agreement"**) is entered into by and between WorldVentures Holdings, LLC, (the **"Employer"**) on behalf of itself, its subsidiaries and other corporate affiliates (collectively referred to herein as the **"Employer Group"**), and Eddie Head            (the **"Employee"**) (the Employer and the Employee are collectively referred to herein as the **"Parties"**) as of Oct 4, 2018            (the **"Effective Date"**).

The Confidentiality Agreement provides that it supersedes any prior agreements between Head and Debtors:

> 10. <u>**Entire Agreement.**</u>
>
> Unless specifically provided herein, this Agreement contains all the understandings and representations between the Employee and the Employer pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

The Confidentiality Agreement also provides for certain restrictive covenants:

15. **Non-Solicitation.**

The Employee agrees that during the term of employment with the Employer and for a period of one (1) year following voluntary or involuntary termination of the Employee's employment from the Employer (the "Separation Date"), the Employee will not:

- directly or indirectly (except on behalf of the Employer), solicit or attempt to solicit, accept business from, divert or attempt to divert, handle or attempt to handle, or service or attempt to service, the account or business of any entity or individual:
  - (i)     that was a party to a contract with the Employer with which the Employee dealt or worked during the six-month period prior to the Separation Date, or
  - (ii)    that was directly solicited by the Employer with the Employee's involvement or assistance during the six-month period prior to the Separation Date, with a view toward establishing a business relationship,

or assist any other person in doing any of the foregoing; or

- directly or indirectly recruit, solicit or hire any employee or independent contractor of the Employer, or induce or attempt to induce any such employee or independent contractor to terminate his/her/its contract or employment, or otherwise to limit or to cease the relationship of such employee or independent contractor with the Employer, or assist any other person in doing any of the foregoing; or

- directly or indirectly interfere or attempt to interfere in any way with the Employer's relationships with any of its customers, clients, sales representatives, suppliers, advisors, consultants, including, without limitation, by inducing or attempting to induce any customers, clients, sales representatives, suppliers, advisors, or consultants to terminate or change the terms of their dealings with the Employer, or assist any other person in doing any of the foregoing.

The Confidentiality Agreement is unambiguous as to the terms and conditions of the restrictive covenants in that agreement and the consideration allegedly provided by Debtors.

59.     As set forth in the paragraph above, Section 15 includes a non-solicitation covenant prohibiting Head from soliciting WorldVentures' customers (but does not contain an industry-wide prohibition).  "Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the [Covenant Not to Compete] Act."[150]

60.     The Texas Covenant Not to Compete Act ("CNCA") bears heavily on the Court's obligation to dismiss the breach of contract claim in this case.  Debtors claim that Head is bound

---

[150] *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex.2011).

---

by the non-compete covenant in the Employment Agreement.  The Employment Agreement is governed by Texas law.  Under Texas law, a non-compete covenant must be the following requirements:

> Notwithstanding Section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise.[151]

61.    "The requirement of an 'otherwise enforceable agreement' is satisfied when the covenant is ancillary to or part of an agreement which contains mutual, nonillusory promises."[152] Before Head signed the Confidentiality Agreement, Head signed the Employment Agreement which contains a non-compete covenant governed by the CNCA.  Debtors claim that they provided "Confidential Information" as consideration to Head in return for his restrictive covenants in the Employment Agreement.  Debtors' agreement to provide Confidential Information would be the "otherwise enforceable agreement."

62.    Almost four months later, Head and WorldVentures signed the Confidentiality Agreement in which they agreed that WorldVentures would provide Confidential Information to Head:

---

[151] Tex. Bus. & Com. Code § 15.50.
[152] *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 852 (W.D. Tex. 2016), citing *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 584 (5th Cir. 2015) (citing *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011)).

a.  Confidential Information

The Employee understands and acknowledges that during the course of employment by the Employer, Employee will have access to and learn about confidential, secret and proprietary documents, materials and other information, in tangible and intangible form, of and relating to the Employer and its businesses (**"Confidential Information"**). The Employee further understands and acknowledges that this Confidential Information and the Employer's ability to reserve it for the exclusive knowledge and use of the Employer is of great competitive importance and commercial value to the Employer, and that improper use or disclosure of the Confidential Information by the Employee might cause the Employer to incur financial costs, loss of business advantage, liability under confidentiality agreements with third parties, civil damages and criminal penalties.

In return for this Confidential Information, Head agreed to be bound by the restrictive covenants set forth in Section 15 of the Confidentiality Agreement, including the non-solicitation provision which is subject to the CNCA (just as the non-compete covenant in Article III of the Employment Agreement is subject to the CNCA. As stated unambiguously in Section 10 of the Confidentiality Agreement, it "supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter," i.e., Confidential Information and restrictive covenants.

63.    The Court raised an issue that the Confidentiality Agreement did not contain terms related to Head's employment, presumably his salary and benefits. Under Texas law, an earlier contract may be superseded only to the extent of the inconsistency with the later contract.[153] Additionally, for a restrictive covenant to be enforceable, it must be ancillary to or part of an otherwise enforceable agreement.[154] In this case, the restrictive covenants in the Confidentiality Agreement are enforceable only if Debtors' agreement to provide Confidential Information to Head in the Confidentiality Agreement was the "otherwise enforceable agreement." This latter agreement supersedes the Employment Agreement because Head's agreement to the restrictive

---

[153] *Hall v. Pro. Leasing Assocs.*, 550 S.W.2d 392, 394 (Tex. Civ. App.—Dallas 1977, no writ), citing Corbin at 213
[154] Tex. Bus. & Com. Code § 15.50.

covenants in the Confidentiality Agreement, in return for Debtors' agreement to provide Confidential Information, is inconsistent with that same "subject matter." The remainder of the Employment Agreement, such as Head's compensation and benefits, remains intact. Consequently, the Confidentiality Agreement only superseded the terms and conditions of the Employment Agreement related to the subject matter of the Confidentiality Agreement. That is, the Confidentiality Agreement superseded the Employment Agreement related to the definition and provision of Confidential Information, and the restrictive covenants, because that is the subject matter, at least in part, of both the Employment Agreement and the later Confidentiality Agreement. The Confidentiality Agreement did not supersede provisions of the Employment Agreement that were not the subject matter of the Confidentiality Agreement, such as Head's compensation and benefits. This must be true, otherwise, there was no reason for Head and WorldVentures to sign the Confidentiality Agreement.

64.     Debtors also alleged that Head "ratified" his Employment Agreement when he responded "received and understood" in response to an email from Debtors' Chief Legal Officer. Head did not receive any benefits under the Employment Agreement after his resignation and, consequently, could not have ratified the terms and conditions related to Confidential Information and restrictive covenants in the Employment Agreement. Further, Debtors do not claim that they were induced into the Confidentiality Agreement by fraud or fraudulent inducement and, therefore, cannot rely on any ratification argument as a matter of law.

65.     Consequently, because the Confidentiality Agreement superseded the Employment Agreement as to the terms and conditions related to Confidential Information and restrictive covenants, and because the Confidentiality Agreement contain a prohibition on solicitation of WorldVentures customers, but no industry-wide prohibition against working for a "Competing

Business," Debtors' breach of contract claim that Head is prohibited from working for a "Competing Business" must be dismissed as a matter of law.

**C.**     **Debtors' breach of fiduciary duty claim should be dismissed because Debtors failed to state a claim upon which relief may be granted.**

66.     Count Two for breach of fiduciary duty must be dismissed because it is based on conclusory allegations unsupported by facts that give rise to a plausible claim.  Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages.[155]  Debtors failed to allege sufficient facts of breach of fiduciary duty or damages to give rise to a plausible claim for breach of fiduciary duty.

67.     Plaintiffs generically allege that Head "owed fiduciary duties to Plaintiffs, including but not limited to the duty of loyalty and good faith, due care, fair dealing, full disclosure and candor, and duty to refrain from self-dealing."[156]  Debtors' conclusory allegations related to this claim include the following which are summarized below with the Debtors' allegations on the left and Head's responses on the right:

| | |
|---|---|
| "Through Head's misconduct and actions alleged during and after his employment, Head willfully and intentionally breached such duties to the detriment of the Company, its estate and its creditors."[157] | Debtors failed to allege the "misconduct and actions" to which they refer.  Debtors failed to allege which duty Head allegedly breached, how Head breached any such duty, or when Head breached any duty.  Debtors failed to allege how such breach was to the detriment of WorldVentures, its estate and its creditors. |
| "Through Head's aforementioned actions and omissions, including negotiating Accetta's employment with Seacret, facilitating the execution of the LSA and other agreements, soliciting and recruiting the Company's employees, WV | Debtors failed to describe the "aforementioned actions and omissions." Debtors failed to allege any facts to support Head's negotiation of Accetta's employment, facilitation of the "execution of the LSA" and other unspecified |

---

[155] *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017), citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010).
[156] Dkt. 76, 55.
[157] Dkt. 76, ¶ 57.

| | |
|---|---|
| Marketing's team leaders and Sales Representatives, and Rovia's exclusive vendor to abandon the Company and participate in the formation and launch of a Competing Business."[158] | agreements. Debtors failed to allege a single WorldVentures Sales Representative or employee that Head has solicited. Debtors failed to allege any facts that any vendor has abandoned the Company because of Head's actions or omissions. |
| "Further, Head apparently knew and failed to disclose material facts to the Company about the transactions involving Seacret, including Seacret's intent to start its own Competing Business. Based on the foregoing actions, Head has breached, among others, duties of care, loyalty, full disclosure, and has usurped corporate opportunities."[159] | Debtors failed to allege what facts are material that Head should have disclosed or when Head should have disclosed such facts. Debtors failed to allege what potential conflicts Head should have disclosed or when he should have disclosed such facts. Debtors failed to allege facts that Head has usurped a corporate opportunity. |

68.     Debtors failed to allege a single fact to support these conclusory allegations. Debtors did not allege any facts as to what information Head used or disclosed to Seacret or anyone else outside of WorldVentures. Debtors failed to allege any fact as to when such use or disclosure occurred. Debtors failed to allege to whom specifically Head made any such disclosure.

69.     Additionally, Debtors must allege a plausible claim that they have been damaged by any such breach of fiduciary duty. As for the alleged damages on their breach of fiduciary duty claim, Debtors allege the following conclusory allegations on the following chart with the Debtors' allegations on the left and Head's response on the right:

| | |
|---|---|
| "Head's breaches of his fiduciary duty resulted in injury to the Company and a benefit to Head. Indeed, Head preserved his own financial welfare while further deteriorating the financial welfare of the Company and its creditors. Head's actions have resulting in a dissipation of the Company's and bankruptcy estate's assets, | Debtors failed to allege a single fact as to how Head's actions have resulted in a dissipation of WorldVentures' estate assets. Debtors failed to allege how Head's actions have disrupted the orderly administration of WorldVentures' estate. To the contrary, in the expedited discovery, Debtors refused to allow Head to conduct |

---

[158] Dkt. 76, ¶ 57.
[159] Dkt. 76, ¶ 57.

---

| | |
|---|---|
| and his actions have disrupted the orderly administration of the Company's estate. Thus, Head has breached his fiduciary duties owed to the Company, its estate, and its creditors in the above-captioned bankruptcy proceeding."[160] | any discovery on this claim. Debtors' Amended Complaint is largely just a change from calling Plaintiffs by the name WorldVentures to call Plaintiffs the "Company." |
| "As a result of Head's intentional and willful breaches of his fiduciary duties, the Company has suffered and continues to suffer irreparable harm to its business, its creditors, and its ability to effectuate a successful chapter 11 bankruptcy."[161] | Debtors failed to allege a single fact in support of this conclusion. Debtors failed to allege any fact that its financial welfare is deteriorating because of any use or disclosure by Head of any confidential information. |
| "As a direct and proximate result of Head's wrongful conduct, the Company has suffered and will continue to suffer economic damages, lost profits, lost business value, loss of goodwill, loss of Members, Sales Representatives, and employees. Head's breaches of his fiduciary duty resulted in injury to WorldVentures and a benefit to Head. Head is liable for actual damages caused by his willful and malicious conduct, and exemplary damages in an amount to be determined at trial."[162] | Paragraph 59 epitomizes Debtors' failure to comply with *Iqbal* and *Twombly*. |

70.     Debtors' allegation as to any breach of fiduciary duty related to the use or disclosure of confidential information, solicitation of any employee or Sales Representative, or facilitation of the LSA, does not meet the requirements of *Iqbal* and *Twombly*.  Count Two for breach of fiduciary duty must be dismissed as a matter of law.

71.     As the Supreme Court stated in *Ashcroft v. Iqbal*, in determining whether a claim is facially plausible, "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice."[163]  Because the only allegations related to solicitation

---

[160] Dkt. 76, ¶ 58.
[161] Dkt. 76, ¶ 59.
[162] Dkt. 1-1, ¶ 46.
[163] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *citing Twombly*, 550 U.S. at 556.

---

of employees or Sales Representatives are conclusory, Count Two for breach of fiduciary duty must

be dismissed as a matter of law.

## IV. ALTERNATIVELY, IF THE COURT DOES NOT DISMISS PLAINTIFFS' CLAIMS, THE COURT SHOULD ORDER PLAINTIFFS TO FILE AND SERVE A MORE DEFINITE STATEMENT UNDER FED. R. CIV. P. 12(E)

72.    Alternatively, to the extent that the Court does not grant the motion to dismiss, the

Debtors should be required to replead as required under Fed. R. Civ. P. 12(e).  Rule 12(e) provides

in pertinent part that:

> a party may move for a more definite statement of a pleading to which a responsive
> pleading is allowed but which is so vague or ambiguous that the party cannot
> reasonably prepare a response. The motion [for more definite statement] ... must
> point out the defect complained of and the details desired.

If a court is presented with an appropriate motion for more definite statement under Fed. R. Civ.

P. 12(e), the court "shall grant the motion and demand more specific factual allegations from the

plaintiff concerning the conduct underlying the claims for relief."[164]   The allegations in the

Amended Complaint are so vague and ambiguous that Defendant cannot reasonably prepare a

response.

73.    Here, the Amended Complaint contains grossly insufficient factual allegations to

support Debtors' claims for breach of contract and breach of fiduciary duty.  Debtors failed to

allege sufficient facts to show Head breached any agreement or breached any fiduciary duty.

Debtors failed to allege sufficient facts that Head used or disclosed any confidential information

to Seacret.  Debtors failed to allege sufficient facts that Head solicited employees or Sales

Representatives.  Debtors failed to allege sufficient facts that they have been harmed.

---

[164] *Thomas v. Independence Township*, 463 F.3d 285, 301 (3rd Cir. 2006).

74.     Accordingly, the Amended Complaint is so vague or ambiguous that Head cannot reasonably prepare a response.[165]  As a result, if this Court does not dismiss Counts One and Two pursuant to Rule 12(b)(6), or if it dismisses only portions of the Complaint, the Court should order Debtors to file and serve a more definite statement of their claims against Head in accordance with Fed. R. Civ. P. 12(e).

## **CONCLUSION**

75.     The Amended Complaint should be dismissed because Debtors failed to state a claim upon which relief may be granted as a matter of law.  Debtors' claims for breach of contract and breach of fiduciary duty based on allegations that Head used or disclosed confidential information, or solicited Sales Representatives, vendors and suppliers, are based on conclusory allegations, and not supported by factual allegations to give rise to plausible claims.  Finally, the Debtors failed alleged any harm on the face of the Amended Complaint, but merely assert legal conclusions.  For all these reasons, Head respectfully requests that the Court dismiss the Amended Complaint and grant such other and further relief to which Head may be entitled.

---

[165] Fed. R. Civ. P. 12(e); *Thomas*, 463 F.3d at 301.

Respectfully submitted,

SINGER & LEVICK, P.C.

By:     /s/Todd A. Hoodenpyle
        Todd A. Hoodenpyle
        State Bar No. 00798264
        hoodenpyle@singerlevick.com
        Michelle E. Shriro
        State Bar No. 18310900
        mshriro@singerlevick.com
16200 Addison Road, Suite 140
Addison, Texas 75001
Tel. (972) 380-5533
Fax (972) 380-5748

ATTORNEYS FOR DEFENDANT
KENNETH E. HEAD

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District and upon the following parties via electronic mail on April 30, 2021.

**Via Email:**  slockhart@foley.com

Steven C. Lockhart
Foley & Lardner LLP
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201

                        /s/Todd A. Hoodenpyle
                        Todd A. Hoodenpyle